# I.      Standard of review.

"Summary judgment is warranted when, after construing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in its favor, there is no genuine issue as to any material fact." *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009). *See* Fed.R.Civ.P. 56(c).

Summary judgment is proper in this case because there is no genuine issue of any material fact and because Plaintiff is entitled to judgment as a matter of law as to the issues brought forth by this motion.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986). This motion is based on the exhibits attached to the accompanying Declaration of Ahmad Keshavarz and the accompanying Local Rule 56.1 Statement Of Material Facts, which incorporates the same exhibits.  A plaintiff moving for summary judgment satisfies its burden by submitting summary judgment proof that establishes all elements of its cause of action as a matter of law.  *San Pedro v. U.S.*, 79 F.3d 1065, 1068 (11th Cir. 1996).  Plaintiff must show that no reasonable trier of fact could find other than for plaintiff.  C*alderone v. U.S.*, 799 F.2d 254, 259 (6th Cir. 1986).  Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.  "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991). A "mere scintilla of evidence" in favor of the nonmoving party will not defeat

summary judgment. *Anderson* 477 U.S. at 251. A nonmoving party must do more than cast a "metaphysical doubt" as to the material facts; it must "offer some hard evidence showing that its version of the events is not wholly fanciful." *Matsushita Elec. Indus. Co. v. Zenith Radio Corps.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir.1998). That is, there must be evidence from which the jury could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 252.

## II.    Procedural History

On October 12, 2011, Plaintiff filed this FDCPA action against Defendant NCO Portfolio Management, Inc. ("NCO" or "Defendant") and its debt collection law firm Mel S. Harris and Associates, LLC ("Harris").  Both Defendants answered in December, 2011 [DE 5, DE 8]. Ms. Polanco and Harris entered into a settlement. On March 23, 2012 Judge Batts "so ordered" a stipulation of dismissal of Harris. At the initial conference on March 23, 2012, Judge Batts stayed discovery and allowed NCO to file a motion for judgment on the pleadings. On March 18, 2013, Judge Batts denied [DE 21] NCO's motion for judgment on the pleadings, holding the facts alleged in the Original Complaint stated a claim for violations of 15 U.S.C. § 1692e and 1692f. *Polanco v. NCO Portfolio Mgmt., Inc.*, 930 F. Supp. 2d 547 (S.D.N.Y. 2013) ("*Polanco I*").

On September 23, 2013, Plaintiff moved to file an amended complaint, which included a claim for conversion. [DE 30-32]. Defendant opposed Plaintiff's motion to amend the complaint, arguing *inter alia* that their admitted failure to return Plaintiff's money for several months could not constitute conversion. [DE 33]. Judge Freeman granted Plaintiff's motion to amend as to her conversion claim [DE 52]. *Polanco v. NCO Portfolio Mgmt., Inc.*, 930 F. Supp. 2d 547 (S.D.N.Y. 2013) ("*Polanco II*"). Plaintiff filed her amended complaint on June 10, 2014. [DE

54]. Plaintiff now moves for summary judgment.

### III.    Undisputed facts.

There are few significant facts in dispute. Most of the following facts come from Defendant's own deposition testimony, undisputed document production, and undisputed fact witness testimony.

On or about January 6, 2006, Defendant filed a state court collections lawsuit ("collections lawsuit") through its debt collection law firm Mel S. Harris & Associates, LLC ("Harris") seeking to collect on a "Retail Charge Account". *See* Plaintiff's Local Rule 56.1 Statement of Material Fact, ¶ 1 ("hereinafter ¶__").

The putative debt was allegedly incurred primarily for family, personal or household purposes. ¶2. The obligation was a "debt" as defined by 15 U.S.C. § 1692a(5) because the putative debt was allegedly incurred primarily for family, personal or household purposes. ¶3.

NCO Portfolio Management, Inc. ("NCO") purchases charged off consumer accounts and attempts to collect on them, either directly themselves or indirectly through others. ¶4. NCO "purchased charged off accounts, hundreds of thousands, millions of accounts" and "placed those accounts for collections to various entities". ¶5. NCO has "literally millions of accounts". ¶6. NCO has approximately 34,000 employees. ¶7. Approximately 9,000 of NCO's 34,000 employees are debt collectors. ¶8. NCO operates in 15 countries. ¶9. NCO has millions of accounts for which it is doing collections. ¶10. NCO collects either directly or through its national network of 165 law firms. ¶11.NCO gives these 165 law firms "operating procedures they have to follow" ¶12. NCO also has its own in-house debt collection legal department and in-house debt collection attorneys. ¶13. NCO's annual revenue is $1.7 billion. ¶14. NCO has filed

over 35,000 lawsuits in New York civil courts alone. ¶15.

NCO never served Ms. Polanco with the collections lawsuit. ¶16. NCO obtained a default judgment against Ms. Polanco on or about March 20, 2006 for $2,451.45 ("the default judgment"). ¶17. The default judgment obtained against Ms. Polanco on or about March 20, 2006 was based on a false affidavit of service. ¶18.

In her affidavit supporting her October 27, 2010 order to show cause, Ms. Polanco swore to specific facts supporting her claim that the process server's affidavit of merit was false. ¶19. The process server served a phantom neighbor who identified himself as Mark Jenkins, and who confirmed that Ms. Polanco was not in military service. ¶20. Ms. Polanco had no neighbor named "Mark" or "Mr. Jenkins," and had not told any of her neighbors whether or not she was in the military. ¶21.

New York City Marshal Martin Bienstock executed on the default judgment, collected on the judgment and forwarded the executed funds to NCO after taking his own fee,. ¶22-24.

Until September 2010, Ms. Polanco did not know that she had a right to seek to have a default judgment vacated. ¶25. On or about October 27, 2010, Ms. Polanco filed a pro se order to show cause to vacate the default judgment and to return the wrongfully garnished funds. ¶26. On October 27, 2010 Civil Court Judge Raul Cruz granted Ms. Polanco's order to show cause, issued an order staying all collection activities and set November 18, 2010 as the date for the hearing to vacate the default judgment. ¶27.

Harris informed NCO's in-house counsel and in-house legal department of the filing of the order October 27, 2010 order to show cause staying collections and setting a hearing on November 18, 2010 to vacate the default judgment. ¶28. NCO's in-house legal department and

4

specifically its in-house counsel Darrell Hastings knew about the November 18, 2010 hearing to vacate the default judgment. ¶29.

Harris gave NCO contemporaneous updates regarding Plaintiff's case. ¶30. NCO took no affirmative steps through Harris to determine whether Ms. Polanco's allegations of sewer service were true. ¶31. NCO took no steps through Harris to examine the process server's service log book: ¶32 Instead, NCO asked Harris to oppose the motion to vacate judgment: ¶33.

On November 18, 2010, the Bronx Civil Court Judge Raul Cruz granted Ms. Polanco's motion, vacated the default judgment, and vacated all liens, restraining orders, and executions based on the judgment. ¶34. Judge Cruz specifically found Ms. Polanco had "shown excusable default and a meritorious defense" to the collection lawsuit. ¶35. As of November 19, 2010, or at the latest, November 26, 2010, Harris notified NCO's in-house counsel and legal department of the November 18, 2010 order vacating the default judgment. ¶36.

Ms. Polanco lives paycheck to paycheck, that is, when she can find work. ¶37. On or about May 2, 2011, Ms. Polanco needed her money back to pay for basic essentials. ¶38. On or about March 2, 2011 Ms. Polanco filed another order to show cause to have her money returned. ¶39. On March 17, 2011, the Bronx Civil Court Judge Ben R. Barbato granted Ms. Polanco's motion and issued a second order again clearly stating that the court vacated all liens, restraining orders, and executions from the vacated judgment. ¶40. On March 17, 2011, the Court also ordered NCO to "forthwith" return to Ms. Polanco any funds or fees taken from her by NCO or any agent of NCO (emphasis added) or be subject to "contempt." ¶41. An attorney for Harris was at the March 17, 2011 hearing. ¶42. Ms. Polanco also sent a copy of the March 17, 2011 order to NCO, through Harris, which was received on April 7, 2011. ¶43.

As of April 14, 2011, NCO's in-house counsel and in-house legal department had

physical possession of March 17, 2011 order, which stated that NCO "shall… forthwith" return "all funds" to Ms. Polanco or be subject to "contempt." ¶44. Despite notification of the March 17, 2011 order, NCO did not release Ms. Polanco's money forthwith: ¶45. NCO admits that returning the money "forthwith," as ordered by the court, would mean to return it "right away" or within a few days. ¶46. On April 11, 2011, NCO forwarded a copy of the order to return the money to another debt collection law firm, Sharinn & Lipshie. ¶47. NCO's position is that Sharinn & Lipshie should have told NCO about information that NCO provided to Sharinn & Lipshie. ¶47. Even after receiving a dispute letter from Ms. Polanco on July 6, 2011, NCO forwarded the letter to Sharinn & Lipshie rather than returning Ms. Polanco's money forthwith. ¶48.

NCO did not return Ms. Polanco's money until August 26, 2011. ¶49. Even today, NCO's position is that it did nothing wrong and it would do the exact thing over again, even knowing what it knows now. ¶ 50.

NCO's actions inflicted damages on Ms. Polanco for personal humiliation, anger, embarrassment, shame, mental anguish, emotional distress, loss of privacy, frustration, anxiety, an inability to sleep, constant fear of being unable to pay for her most essential needs, and other distress that disrupted her activities of daily living. ¶51-52.

Ms. Polanco was unemployed for some of the period when NCO was refusing to return the money, and she desperately needed the return of her money to pay for basic essentials. ¶53. She was unable to pay rent and was subject to eviction proceedings. ¶54. She was under continuing risk of her power being shut off because of her inability to timely pay the electric bill. ¶55. She had to borrow money from a friend, and was ashamed and embarrassed in having to do so. ¶56.

6

After Ms. Polanco finally had her money returned, her symptoms subsided, but she still had trouble sleeping for a period of time, trying to get back into her rhythm from all of the stress and anxiety inflicted by NCO. ¶57.

## IV.    Public policy of the FDCPA.

Congress enacted the FDCPA in response to "evidence of the use of abusive, deceptive, and unfair debt collection practices by many debt collectors."   15 U.S.C.A. § 1692(a).   The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses."   15 U.S.C. § 1692(e).   Accordingly, Congress enacted the FDCPA "to protect consumers from deceptive or harassing actions taken by debt collectors[,]" *Kropelnicki v. Siegel*, 290 F.3d 118, 127 (2d Cir.2002), with the purpose of "limiting the suffering and anguish often inflicted by independent debt collectors." *Russell v. Equifax A.R.S.*, 74 F.3d 30, 34 (2d Cir.1996) (internal quotation marks omitted). "Congress painted with a broad brush in the FDCPA to protect consumers from abusive and deceptive collection practices." *Pipiles v. Credit Bureau of Lockport, Inc.*, 886 F.2d 22, 27 (2d Cir.1989).

Congress designed the FDCPA to be enforced primarily through private parties – such as such as Ms. Polanco– acting as "private attorneys general."   *See* S. Rep. No. 382, 95th Con., 1st Sess. 5 ("The committee views this legislation as primarily self-enforcing; consumers who have been subject to debt collection abuses will be enforcing compliance."); *Jacobson v. Healthcare Fin. Servs.*, 516 F.3d 85, 91 (2d Cir. 2008) ("In this way, the FDCPA enlists the efforts of sophisticated consumers like [Plaintiff] as 'private attorneys general' to aid their less

sophisticated counterparts, who are unlikely themselves to bring suit under the Act, but who are assumed by the Act to benefit from the deterrent effect of civil actions brought by others.").

The FDCPA is a strict liability statute. *Bentley v. Great Lakes Collection Bureau*, 6 F.3d 60, 63 (2d Cir. 1993) (''The FDCPA is a strict liability statute . . . and the degree of a defendant's culpability may only be considered in computing damages . . .''); *Ellis v. Solomon & Solomon, P.C.*, 591 F.3d 130, 135 (2d Cir.2009), *cert. denied*, 130 S. Ct. 3333, 176 L. Ed. 2d 1223 (2010) ("To recover damages under the FDCPA, a consumer does not need to show intentional conduct on the part of the debt collector.")

## V.    Argument

Plaintiff is entitled to summary judgment as to liability because there are no genuine issues of material fact left to be determined and the remaining issues can be decided as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986).

### A.  Preliminary issues.

NCO is a "debt collector" as defined in 15 U.S.C. § 1692a(6) because it purchases millions of consumer accounts after they are in default with the putative original creditors. ¶¶ 4, 5, 10. NCO then attempts to collect them directly itself or indirectly through others, including through its own network of 165 law firms. ¶¶ 11 NCO gives these 165 law firms "operating procedures they have to follow" ¶12. NCO also has its own in-house debt collection legal department and in-house debt collection attorneys. ¶13. NCO has filed over 35,000 lawsuits in New York civil courts alone. ¶.15. It is black letter law that a debt collector includes an assignee such as NCO that regularly collects debts that are already in default at the time of assignment, or

whose principal purpose is to collect such debts. *See, e.g. Wadlington v. Credit Acceptance Corp.*, 76 F.3d 103, 106 (6th Cir.1996); *Perry v. Stewart Title Co.*, 756 F.2d 1197, 1208 (5th Cir. 1985); *Cirkot v. Diversified Fin. Sys., Inc.*, 839 F.Supp. 941, 944 (D. Conn.1993); *Kimber v. Fed. Fin. Corp.*, 668 F.Supp. 1480, 1483–86 (M.D. Ala. 1987).

The obligation alleged by NCO to be owed by plaintiff is a "debt" as defined by 15 U.S.C. § 1692a(5) because the putative credit card debt was incurred primarily for family, personal or household purposes. ¶¶ 2, 3. Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3) because she was alleged to owe a "debt."

### B. This Court has already held that the facts alleged in the Original and First-Amended Complaint states a claim for violations of the FDCPA and for conversion, and the facts alleged in those complaints are now undisputed.

Plaintiff alleged certain facts in her original and proposed amended complaints. This Court has already held that if Plaintiff can prove the facts alleged, then NCO has violated the FDCPA (*Polanco I*) and had committed conversion. (*Polanco II*)  The undisputed summary judgment facts establish all the material facts in the original and amended complaints. Therefore Plaintiff is entitled to summary judgment.

### 1.    Polanco I explains why NCO violated the FDCPA.

In *Polanco I*, the Court held that the allegations in Plaintiff's original complaint stated a claim for NCO's violation of the broad prohibitions on debt collector conduct under 15 U.S.C. § 1692e and 1692f:

> Polanco alleges that Defendant attempted to collect her credit card debt via a two-part scheme: falsifying an affidavit of service to obtain a default judgment against her and ignoring subsequent Court Orders to return the improperly collected debt for over a ten-month period. Given that the purpose of the FDCPA is to protect consumers and to limit their "suffering and anguish," *Gabriele [v. Am. Home Mortg. Servicing, Inc.,]* 2012 WL 5908601, at *3  [(2d Cir. Nov. 27, 2012) (unpublished)], Defendant's ten-month refusal to

comply with two Court Orders that vacated a fraudulently received judgment falls within FDCPA's broad purpose.[4] *See Alibrandi v. Fin. Outsourcing Serv., Inc.,* 333 F.3d 82, 87 (2d Cir.2003) (noting "FDCPA's broad, pro-debtor objectives"); *see also Pipiles v. Credit Bureau of Lockport, Inc.,* 886 F.2d 22, 27 (2d Cir.1989) ("Congress painted with a broad brush in the FDCPA to protect consumers from abusive ... debt collection practices.").

Although Defendant's noncompliance does not fall within the FDCPA's proscribed behaviors, "[t]he list ... is non-exhaustive, and the FDCPA generally forbids collectors from engaging in unfair, deceptive, or harassing behavior." *Kropelnicki v. Siegel,* 290 F.3d 118, 127 (2d Cir.2002). It also proscribes using "unfair or unconscionable means" to collect a debt. 15 U.S.C. § 1692f. Here, Defendant's alleged actions of fraudulently using the court's power to secure a default judgment and subsequent garnishment and then refusing to obey promptly that same Court's Orders falls within the FDCPA's broad purpose to protect consumers from such alleged abusive and unfair tactics. Because Plaintiff has pleaded facts sufficient to make it facially plausible that she is entitled to relief, Defendant's Motion for Judgment on the Pleadings is HEREBY DENIED.

> Fn. 4 … Analogously, when a defendant falsifies court documents in order to receive a default judgment and then refuses to promptly comply with a Court Order that vacated that default judgment and return the funds, such behavior should be subject to liability under the FDCPA

*Polanco I*, 551-52.

The undisputed summary judgment facts support the basis of the holding of *Polanco I*. No reasonable fact finder to conclude other than that the default judgment was rendered based on a false affidavit of service. The default judgment obtained against Ms. Polanco on or about March 20, 2006 was based on a false affidavit of service. ¶18. In her affidavit supporting her October 27, 2010 order to show cause, Ms. Polanco swore to specific facts supporting her claim that the process server's affidavit of merit was false. ¶19. The process server served a phantom neighbor who identified himself as Mark Jenkins, and who confirmed that Ms. Polanco was not in military service. ¶20. Ms. Polanco further swore in her affidavit that she had no neighbor named "Mark" or "Mr. Jenkins," and had not told any of her neighbors whether or not she was in the military. ¶21. The conclusive nature of the sewer service evidence is bolstered by the specific finding by Bronx Civil Court Judge Raul Cruz in his November 18, 2010 order vacating the default judgment that Ms. Polanco had "shown excusable default and a meritorious defense" to

the collection lawsuit. ¶35. Lastly, Harris, the collection law firm NCO used to obtain the default judgment against Polanco has been found to systematically engaged in sewer service thousands of collection lawsuits.[1]

Certainly, NCO is liable by ratification when Polanco stated the factual basis of sewer service but took no steps to determine whether the allegations were true but instead attempted to retain the fruit of the poison tree. *See* Restatement (2d) of Agency 88, 99. Indeed, NCO's in-house legal department every step of the way in the order to show cause. Harris informed NCO's in-house counsel and in-house legal department of the filing of the order October 27, 2010 order to show cause staying collections and setting a hearing on November 18, 2010 to vacate the default judgment. ¶28. NCO's in-house legal department and specifically its in-house counsel Darrell Hastings knew about the November 18, 2010 hearing to vacate the default judgment. ¶29. Harris gave NCO contemporaneous updates regarding Plaintiff's case. ¶30. NCO took no affirmative steps through Harris to determine whether Ms. Polanco's allegations of sewer service were true. ¶31. NCO took no steps through Harris to examine the process server's service log book: ¶32 Instead, NCO asked Harris to oppose the motion to vacate judgment: ¶33.

Importantly, as argued toward the end of this motion, NCO would bear FDCPA and conversion liability even if it was *never* specifically contacted by Harris regarding the order to show cause because NCO 1) is directly liable as the party in the collection lawsuit and 2) is liable

---

[1] On October 6, 2009, Mel Harris was sued in a class action for intentionally using process servers that engaged in sewer service and for filing false affidavits of merit. *Original Complaint, Sykes v. Mel Harris & Associates, LLC,* 2009 WL 3244810 (S.D.N.Y.) (October 6, 2009). In his September 4, 2012 order granting class certification in *Sykes,* Judge Chin found that the very records of Harris demonstrated their widespread use of false affidavits of service. *Sykes v. Mel Harris & Associates, LLC,* 2012 WL 3834802 at * 2, 3. (S.D.N.Y. Sept. 4, 2012) ("Between January 2007 and January 2011, Samserv defendants performed service of process in 94,123 cases filed by Mel Harris in New York City Civil Court, 59,059 of which were filed on behalf of Leucadia defendants.  Records maintained by defendants reveal hundreds of instances of the same process server executing service at two or more locations at the same time…These facts, together with the high number of default judgments obtained by defendants, provide substantial support for plaintiffs' assertion that defendants regularly engaged in sewer service.")

for the acts of its agent Harris operating within the course and scope of its agency. Further, the FDCPA itself makes NCO, a debt collector in its own right, liable for FDCPA violations Harris commits in collecting for NCO.

### 2. *Polanco II* explains why NCO committed the tort of conversion.

In *Polanco II*, the Court held that the allegations in Plaintiff's proposed amended complaint stated conversion claim against NCO.

> Plaintiff proposes to plead that Defendant "interfered with [Plaintiff's] right to the money by refusing to return it for more than 5 months after being ordered that [Defendant] 'shall ... forthwith' return 'all funds' to [Plaintiff] or be subject to 'contempt.' " (Proposed Am. Compl. ¶ 40). Plaintiff alleges that Defendant's in-house counsel had "physical possession" of the March 2011 Court Order for four and a half months before returning Plaintiff's money. (*Id.* ¶ 41). Accepting Plaintiff's factual allegations as true, Plaintiff's proposed pleading for conversion "state[s] a claim to relief that is plausible on its face.' " *See Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955).
>
> **1.** *Allegation That Defendant Acted Without Authorization*
> … The alleged unauthorized action, however, took place when Defendant failed to return the money for several months after receiving the Bronx Civil Court's order to do so "forthwith." Even though Defendant may have originally had authorization to hold the funds, Plaintiff's allegation that Defendant failed to return the funds for months after receiving an order to do so is a sufficient factual predicate for a claim for conversion. *See Okyere v. Palisades Collection, LLC,* 961 F.Supp.2d 522, 534 (S.D.N.Y.2013) (denying motion to dismiss a conversion claim and noting that "even if the initial taking of the money was authorized, the complaint alleges that the [defendants] deliberately refused for many months to comply with a written demand to return the money...."). Further, Plaintiff argues that Defendant obtained a default judgment in its collections suit "based on the systematic use of false affidavits by [Defendant's] law firm." (Pl. Reply at 4.) If this allegation is taken as true, then Defendant cannot use the Bronx Civil Court's order to immunize itself from liability. *See Calamia,* 879 F.2d at 1031
> ….
>
> **4.** *Allegation That Defendant Refused To Return Funds*
> Defendant argues that Plaintiff has not properly alleged a claim for conversion because Plaintiff's proposed pleading lacks the element of refusal. Defendant argues that it never refused to return Plaintiff's money and, instead, returned Plaintiff's money in full at the direction of its independent attorneys after waiting for their instructions on that issue. (Def. Mem. at 10–11.)
> Defendant's argument again misses the mark. While Plaintiff concedes that the money was eventually returned (*see* Proposed Am. Compl. ¶¶ 27, 30), this does not render the

proposed pleading of conversion futile where Plaintiff seeks to plead that Defendant knowingly held the money without authorization for months. Indeed, in an analogous case, this Court recently rejected the argument that a plaintiff had failed to state a claim for conversion "because the funds were returned to him six months after they were taken," noting that "[r]eturning property to the rightful owner does not absolve defendants of all liability from the alleged conversion" and that a "claim for conversion will exist even when the deprivation is partial or temporary." *See Okyere,* 961 F.Supp.2d at 534 (citations omitted).

Equally misguided is Defendant's attempt to rely on the deposition testimony of its corporate representative to demonstrate supposed flaws in Plaintiff's pleading of the element of "refusal." In this regard, Defendant points to its witness's explanation of the delay in the return of Plaintiff's money—*i.e.,* that Defendant was awaiting advice from its new counsel, and that it returned the funds when it was instructed by counsel to do so, (*See* Def., Mem., at 10–11 (citing Easley Decl., Ex. B (Transcript of deposition of Michael G. Noah, conducted August 6.2013) (Dkt. 33–3) at 8, 13–14, 38, 39, 41, 42).) Even if the deposition transcript of Defendant's witness should be deemed integral to the proposed Amended Complaint, the witness's explanation of Defendant's conduct would not undermine the sufficiency of Plaintiff's proposed pleading. Plaintiff's proposed conversion claim rests on the allegation that Defendant had knowledge of the court's order requiring the return of Plaintiff's funds "forthwith," and it is at least plausible that Defendant's professed reason for its delay in complying with that order, even if taken as true, would not legally excuse its retention of the funds for a period of months.

*Polanco II*, 2014 WL 2483180, at *5-7.

The summary judgment facts support the factual basis for Polanco's conversion claim. More than 5 months elapsed between when NCO was ordered to return Ms. Polanco's money forthwith and the date the money was actually returned. On March 17, 2011, the Bronx Civil Court Judge Ben R. Barbato vacated the sewer service default judgment and ordered NCO to "forthwith" return to Ms. Polanco's previously garnished money or be subject to "contempt." ¶¶ 40, 41. An attorney for Harris was at the March 17, 2011 hearing. ¶42. Ms. Polanco also sent a copy of the March 17, 2011 order to NCO, through Harris, which was received on April 7, 2011. ¶43. Despite notification of the March 17, 2011 order, NCO did not release Ms. Polanco's money forthwith: ¶45. NCO admits that returning the money "forthwith," as ordered by the court, would mean to return it "right away" or within a few days. ¶46. On April 11, 2011, NCO forwarded a copy of the order to return the money to another debt collection law firm, Sharinn &

Lipshie. ¶47. NCO's position is that Sharinn & Lipshie should have told NCO about information that NCO provided to Sharinn & Lipshie. ¶47. Even after receiving a dispute letter from Ms. Polanco on July 6, 2011, NCO forwarded the letter to Sharinn & Lipshie rather than returning Ms. Polanco's money forthwith. ¶48. NCO did not return Ms. Polanco's money until August 26, 2011. ¶49. Even today, NCO's position is that it did nothing wrong and it would do the exact thing over again, even knowing what it knows now. ¶ 50.

### C. Other courts also agree with reasoning that also supports this Court's holdings in *Polanco I* and *II*.

*Okyere v. Palisades Collection, LLC*, 961 F. Supp. 2d 522 (S.D.N.Y. 2013) (*Okyere II*) directly supports the holdings of *Polanco I* and *II*. Indeed, *Okyere II* cites to *Polanco I* as authority for the FDCPA claim and *Polanco II* cites to *Okyere II* in support of the conversion claim. In *Okyere II*, debt collection creditor Palisades played a role analogous to NCO in the present case. Palisades obtained a default judgment against Mr. Okyere based on sewer service. On May 12, 2011, Mr. Okyere obtained an order for Palisades to return his previously garnished funds "forthwith." Instead, Palisades did not return the money for almost 6 months, on November 17, 2011. *Id*. at 525, 526. The Court held that the failure to promptly return the money constituted a violation of 1692f. The Court held:

> Under the facts alleged here, the Court believes that a jury might reasonably conclude that (1) removing money from a bank account when a court has forbidden this to occur[2] and (2) deliberately refusing for many months to return money seized from a bank account where a court has ordered it returned "forthwith" constitute acts that affront the sense of "justice, decency or reasonableness." Indeed, courts have applied 1692f to conduct similar to what defendants did here: for example, filing an application for a writ of garnishment when the plaintiff did not owe any money, *Fox v. Citicorp Credit Servs., Inc.,* 15 F.3d 1507, 1517 (9th Cir.1994); garnishing a bank account with the knowledge that it contained exempt funds, *Bray v. Cadle Co.,* 2010 WL 4053794, at *15

---

[2] In Okyere II, on April 25, 2011 Mr. Okyere obtained an initial order to cease collection activities pending a hearing on the motion to vacate the judgment and return the money. However, three weeks late, on May 13, 2011, Palisades, acting through its agents (a debt collection law firm and a NYC Marshal) took $2,513.30 from Mr. Okyere's bank account. *Okyere II* at 525, 526.

(S.D.Tex.2010); *Hogue v. Palisades Collection, LLC,* 494 F.Supp.2d 1043, 1051 (S.D.Iowa 2007); *Todd v. Weltman, Weinberg & Reis, Co., L.P.A.,* 348 F.Supp.2d 903, 915 (S.D.Ohio 2004), *aff'd,* 434 F.3d 432 (6th Cir.), *cert. denied,* 549 U.S. 886, 127 S.Ct. 261, 166 L.Ed.2d 151 (2006); and drawing money from a consumer's bank account without authorization, *Lovelace v. Stephens & Michaels Assocs., Inc.,* 2007 WL 3333019, at *4–5 (E.D.Mich.2007).

*Okyere II* at 531.

Further the Court held Palisade's retention of Mr. Okyere's money for nearly 6 months after an order to return the money "forthwith" constituted conversion, even though the money was ultimately returned. *Okyere II* at 535.

### D. NCO is directly and vicariously liable for the acts it took as the named party in the collection lawsuit.

In the first instance, NCO is directly liable for the FDCPA violations and conversion committed in the course of the debt collection lawsuit because NCO was a *party* to the lawsuit. As with any corporation, NCO can only act in court proceedings through an attorney. *See* N.Y. C.P.L.R 321(a) (prohibiting corporations from bringing suit other than through counsel).  Thus the acts taken during the debt collection lawsuit are necessarily the acts of the corporate party.

Further, NCO, as the client, necessarily has the right to control its outside law firms. NY Professional Disciplinary Rule 1.2(a) (client's control over his counsel as a matter of right). Under general rules of agency, NCO would be liable for the acts of its agents (i.e. Harris) as NCO has a *right* to control Harris. 2A N.Y. Jur. 2d Agency § 296 (principal liable for act of agent for which the principal had the mere right to control).

Lastly, the FDCPA itself makes NCO, itself a debt collector, liable for the acts of NCO's own debt collector.

An excellent summation of NCO's liability here is in the prior decision in the Okyere case, *Okyere v. Palisades Collection, LLC*, 961 F. Supp. 2d 508 (S.D.N.Y. 2013) (*Okyere I*).

There, Palisades attempted to use the law firm it retained to collect a debt as a shield from

FDCPA liability from the acts the law firm took on behalf of Palisades.

 As Palisades notes, the complaint makes no allegations that it took any action with respect to the violations alleged in the complaint other than engaging the Houslanger Defendants to represent it in court. *See* Palisades' Reply at 2. As a result, Palisades argues that it cannot be liable for the acts of the Houslanger Defendants. *Id.* at 2–3.

 This argument is rejected. Case law has held that an entity that "itself meets the definition of 'debt collector' may be held vicariously liable for unlawful collection activities carried out by another on *516 its behalf." *Pollice v. Nat'l Tax Funding, L.P.,* 225 F.3d 379, 404 (3d Cir.2000). In *Pollice,* for example, a company called NFT, which was involved in purchasing delinquent claims from municipalities, entered into an agreement with another debt collection company, CARC, under which CARC would collect on claims for the benefit of NFT. 225 F.3d at 385–86. Similar to Okyere's complaint, the plaintiff's complaint in *Pollice* stated throughout that NFT committed certain violations of the FDCPA "through" CARC. *Id.* at 386–87, 393. The Third Circuit held that NFT "may be held vicariously liable for CARC's collection activity" because a debt collector subject to the FDCPA should "bear the burden of monitoring the activities of those it enlists to collect debts on its behalf." *Id.* at 405.

 Indeed, cases have specifically noted that vicarious liability may attach in the context of an attorney-client relationship where both the attorney and its client constitute "debt collectors" under the FDCPA. *See Fox v. Citicorp Credit Servs., Inc.,* 15 F.3d 1507, 1516 (9th Cir.1994). In *Fox,* the Ninth Circuit held that a debt collection company could be held liable for its attorney's violation of the FDCPA's venue provision—even if the decision was made "solely by" its attorney. *Id.* ("[W]e ... conclude that Congress intended the actions of an attorney to be imputed to the client on whose behalf they are taken."). Other cases have reached similar results. *See, e.g., Martsolf v. JBC Legal Grp., P.C.,* 2008 WL 275719, at *11 (M.D.Pa. Jan. 30, 2008) (debt collection company and its attorney "undisputedly maintain an attorney-client and agent-principal relationship for the purpose of collecting debts" and thus the debt collection company is "vicariously liable for FDCPA infractions that [its attorney] commits while acting on its behalf."); *Oei v. N. Star Capital Acquisitions, LLC,* 486 F.Supp.2d 1089, 1094–96 (C.D.Cal.2006) (citing cases) (stating that "courts routinely hold debt collectors vicariously liable under the FDCPA for the conduct of their attorneys in collecting debts on their behalf" and rejecting debt collection company's argument that it could not be held liable for its attorney's conduct because it was an independent contractor); *accord Newman v. Checkrite Cal., Inc.,* 912 F.Supp. 1354, 1369–72 (E.D.Cal.1995); *Kimber v. Fed. Fin. Corp.,* 668 F.Supp. 1480, 1486 (M.D.Ala.1987); *cf. Caron v. Charles E. Maxwell, P.C.,* 48 F.Supp.2d 932, 936–37 (D.Ariz.1999) (no vicarious liability for attorney's actions where client was not a debt collection company).

…

 Moreover, the nature of an attorney-client relationship itself reflects that the client has the power to "control" its agent in material respects if the client wishes to do so. *See generally Martsolf,* 2008 WL 275719, at *10–11 (existence of attorney-client relationship, in which debt collection company retained law firm and transmitted

information to firm for the purposes of debt collection services, showed exercise of control sufficient to hold debt collection company vicariously liable for attorney's actions); *Oei,* 486 F.Supp.2d at 1094–95 (not requiring explicit showing of control over attorney's actions to find vicarious liability); *see also Kimber,* 668 F.Supp. at 1486 (noting that without vicarious liability for an attorney's actions, a "debt collector could simply evade the [FDCPA] by hiring an attorney to do what it could not do itself"). Okyere has alleged that both Palisades and the Houslanger Defendants meet the definition of "debt collector" under the FDCPA, and that they maintained an attorney-client relationship. *See* Compl. ¶¶ 8–10, 32, 54. There is no suggestion that the Houslanger Defendants acted outside the scope of their authority. Therefore, Palisades may be held vicariously liable for the actions of the Houslanger Defendants.

*Okyere II,* 515-17.

## VI.    Conclusion.

For these reasons, Plaintiff prays for the court to enter summary judgment on her behalf and to allow this case to proceed to trial solely on the issue of damages.

Dated: Brooklyn, New York

> Respectfully submitted,
> */s/*
> Ahmad Keshavarz
> ATTORNEY FOR PLAINTIFF
> The Law Office of Ahmad Keshavarz
> 16 Court St., 26th Floor
> Brooklyn, NY 11241-1026
> Phone: (718) 522-7900
> Fax:    (877) 496-7809
> Email: ahmad@NewYorkConsumerAttorney.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

> Defendant NCO Portfolio Management, Inc.
> by and through its attorney of record
> Aaron R. Easley
> SESSIONS, FISHMAN, NATHAN & ISRAEL, L.L.C.
> Direct: 908.237.1660 | Fax: 908.237.1663  | Email: aeasley@sessions-law.biz
> 3 Cross Creek Drive, Flemington, NJ 08822-4938

Dated:  Brooklyn, NY
　　　　December 11, 2014
　　　　 /s/
　　　　Ahmad Keshavarz